## Warren's Adm'r v. Stith et al.

Nov. 18, 1941.

834

Hubbard Bros. and Robert Hubbard for appellant.

Edw. J. Hogan and Richard P. Dietzman for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

On December 9, 1938, Thomas Stokley Warren was struck and injured by an automobile owned by Allen Stith and being operated by Thomas J. Stith. As a result of his injuries Warren died on the following morning, December 10. Noah Warren, father of decedent, was appointed and qualified as administrator of his deceased son's estate and brought this action in the Jefferson Circuit Court against Allen Stith and Thomas J. Stith to recover damages for the death of his decedent. It is alleged that Thomas J. Stith was the agent employee of Allen Stith and that the accident was caused by the negligent operation of the car driven by Thomas J. Stith.

The defendants filed their joint answer which consisted of, (a) a traverse, (b) a plea of contributory negligence on the part of plaintiff's decedent, and (c) that defendants had settled and compromised the claim with plaintiff, administrator. By reply plaintiff controverted defendants' plea of contributory negligence and pleaded, in substance, that the alleged settlement of the claim was procured by fraud and misrepresentations on the

part of defendants, their agents and representatives, and further that plaintiff's mental condition and state of mind because of worry and grief over the death of his son was such that he was mentally incapable of transacting business and that he did not appreciate or understand the import and nature of the alleged settlement of the claim relied on by defendants.

The case was tried before a jury and resulted in a verdict in favor of defendants and from a judgment entered dismissing plaintiff's petition, and the subsequent order overruling a motion and ground for a new trial, plaintiff has prosecuted this appeal. The grounds urged for a reversal pertain to the evidence and instructions to the jury.

The accident occurred on the Dixie Highway in Jefferson County in front of or near a road house known as Riverview Inn. At this point the Dixie Highway runs north and south. The Riverview Inn is located on the west side of the highway about thirty feet from the hard surface of the road. On the side next to the Inn, and almost directly in front of it, there was a truck parked five or six feet off the hard surface of the road, headed south; and on the opposite or west side of the road there was another truck loaded with tobacco parked about three or four feet off the hard surface of the road, headed north. The three men—Allen, Hardin and Greer—who were in charge of the tobacco truck, had parked it and had gone across the highway to the Riverview Inn and the deceased was there in the Inn, and it appears from the evidence that he was more or less intoxicated. One witness stated that he was drunk; another said he was drinking some and perhaps had drunk two or three bottles of beer. The deceased appeared to be very anxious to buy some tobacco from the men, or one of them, in charge of the tobacco truck, and offered them $2 for one "stock" of tobacco, which sum was about four times the value of that amount of tobacco. They told him that the tobacco was packed or loaded on the truck and they could not disturb it to sell that small amount. The three men in charge of the truck of tobacco left the Inn and went across the road to the truck to resume their trip on to Louisville to where they were taking the tobacco to market. Hardin and Greer were a few feet in front of Allen while crossing the road and the deceased was just behind Allen, still insisting that Allen sell him a stock of to-

bacco. Allen testified that when he was at the center of the road at the white line, with the deceased just behind him, he, Allen, saw the Stith car that struck deceased, coming a distance of about 150 feet from them. He said he continued on across the road at the same gait he was walking and after he had gotten about five or six feet off the hard surface of the road he heard the Stith car strike deceased; that he did not see deceased after he, Allen, cross the center of the road and he did not know where deceased was or what he was doing after he, Allen, passed the center of the road. According to the evidence of other witnesses, after deceased reached the center of the road at the point where Allen last placed him before he was struck, he turned and went back to the west side of the road toward the Inn and then turned and started across the road the second time and suddenly walked out from behind the parked truck on the west side of the road directly into the path of the Stith car. The defendant Thomas Stith who was driving the car, and another witness who was in the car with him, both testified that when they were approaching the Inn and the two parked trucks on either side of the road, the road was clear and they saw no one until their car was practically opposite the rear of the truck and the deceased suddenly appeared from behind the front of the truck into their path. The driver cut his car to the left in an effort to avoid striking deceased but he struck him while he was in the center or perhaps a little to the left of the center of the road. He said that under the circumstances striking deceased was unavoidable and caused by his sudden appearance from behind the truck which obstructed the driver's view. The evidence is not seriously, if at all, conflicting as to how the accident occurred.

The jury did not specify in its verdict upon which issue it found for defendants, whether it was upon the binding effect of the settlement of the claim with plaintiff administrator, or upon the plea of contributory negligence on the part of the deceased. We may say, however, that we think the evidence is sufficient to sustain the verdict upon the issue of contributory negligence, if the jury based its finding upon that issue. However, an incident occurred after the case was submitted to the jury, which we will hereinafter discuss, indicating that the jury found for defendants upon the issue of the binding effect of the contract of settlement, which issue, of

course, involves the question of whether or not plaintiff was mentally competent to enter into the settlement at the time it was made. There is no claim or contention that plaintiff was crazy or insane, in the usual sense in which those terms are ordinarily used. Plaintiff says that the death of his son was a great shock to him. He said that he had heard on the night before that his son had been involved in an accident and it worried him so that he could not sleep and when he heard of his son's death early the next morning it was a terrible shock to him. He was asked what effect, if any, it had on him, and he said:

"I was there at home, trying to cook me a little breakfast and when they come and told me the boy was dead I just went to pieces—it tore me all to pieces; and I cried and went on, and I couldn't do nothing at all. Finally they commenced talking to me, trying to console me and get me reconciled; said there would have to be a coffin got and get ready for the burying."

This is all the evidence bearing on the question of plaintiff's mental condition at the time he made the settlement with the defendants or the representative of the insurance carrier.

It appears that in the forenoon of the day, or just shortly after, plaintiff learned of his son's death, he, in company with his son Paul Warren and son-in-law, Phil Goodman, went to Louisville to make arrangements about purchasing a casket and the burial of decedent. In the afternoon of the same day he went back to his home in Meade County. He said that on his way back home he received information that defendant Allen Stith had been looking for him and on that night about nine o'clock Stith came to his home; that Stith shook hands with him and expressed to him his sympathy and sorrow concerning the tragedy and said that it was not his son's fault; that he was going to help him all he could and wanted to do something for him if he would accept it. He said he told Mr. Stith that he was too badly worried to talk any kind of business, and that Stith said:

" 'Well, then, maybe if I come back tomorrow—the funeral is going to be at the house, isn't it?' I said: 'Yes, sir.' He said 'If I come back tomorrow—

maybe you can get some sleep tonight, and you can talk to me tomorrow.' I said: 'I don't think so. I will try my best.' "

He said that on the same night defendant Tom Stith talked to him and said that his father was going to help him. He said that this all occurred while his son was a corpse in the coffin in his home. He further said that defendants again approached him on the question of a settlement of the claim at the cemetery when his son was buried; that he told them on all of these occasions that he. was too badly worried to talk business, but that they still persisted in talking to him about a settlement.

Defendants admitted that they visited the home of plaintiff and also attended the funeral on the occasions referred to in plaintiff's evidence, and expressed to him their sorrow, but they denied that they talked to him about any settlement of the claim until Monday following the funeral which was on Sunday. Allen Stith said that he reported the accident to the adjuster of the insurance company with which he had insurance on the car, and that the adjuster took charge of the question of settlement. It appears that Stith's insurance policy contained a provision to the effect that if the insured intermeddled in a settlement it would void the insurance and for that reason he left the whole matter up to the insurance adjuster. However, after the insurance adjuster had made his investigation and contacted plaintiff, he and defendant Allen Stith located plaintiff at his son's home in Louisville on Monday following the funeral. They made arrangements to have plaintiff appointed administrator of his deceased son's estate, and it appears that on that night they then began negotiations or discussions looking to a settlement of the claim. It appears that plaintiff's wife had died sometime previous and plaintiff still owed the funeral bill and expenses of her burial, and the insurance adjuster and Mr. Stith offered to pay plaintiff the sum of the unpaid funeral bills and expenses for the burial of his wife, and the funeral bill and expenses for the burial of the deceased Thomas Stokley Warren, and $100 in addition, making a total of $276. Plaintiff retired to another room with his son Paul Warren and conferred with him about accepting the sum offered in settlement of the claim, and then reappeared in the room where the insurance adjuster and Mr. Stith were seated and agreed to accept the offer.

The contract of settlement is filed with the record and it plainly states that it is in full of all claims and damages arising out of the accidental death of the deceased. The insurance adjuster, Charles W. Porter, gave plaintiff a check for the amount agreed upon, signed "Charles W. Porter, Adjuster." On the face of the check appear these words: "To State Farm Mutual Automobile Insurance Company of Bloomington, Illinois." Plaintiff accepted the check and kept it until the afternoon of the next day before he cashed it. It is insisted for plaintiff that defendants failed to reveal to plaintiff that they carried public liability insurance on the Stith car, and the suppression of this fact had some bearing on plaintiff's acceptance of the sum paid in settlement of the claim. Even though it had been improper for defendants to fail to disclose to plaintiff that they carried insurance on the car the check itself was sufficient notice to plaintiff that the car was insured. Be that as it may, however, we do not think it was incumbent upon defendants to voluntarily reveal to plaintiff that they had the car insured. He does not claim that he asked them about insurance, nor that they did anything except that they failed to voluntarily tell him that they carried insurance on the car. Plaintiff relies upon the case of Toppass v. Perkins' Administratrix, 268 Ky. 186, 104 S. W. (2d) 423. In that case it appears that the owners of the car, or those who were liable for the accident, represented that they were insolvent and that no recovery or collection of a judgment could be had against them, and for that reason a meager sum was accepted in settlement of the claim. We have no such situation in the present case. We do not think the Toppass case, supra, supports plaintiff's contention that a fraud was committed upon him by the mere failure of defendants to voluntarily reveal to him that they had insurance. There is no claim that they said anything about their solvency or insolvency.

Plaintiff offered evidence before the jury pertaining to the concealment of the fact that defendants carried liability insurance which evidence the court rejected, and complaint is made of that ruling. It is the well known rule, subject to rare exceptions, that it is improper to get before the jury the fact that a defendant is protected by insurance in this class of cases. Since there was no fraud committed on plaintiff involving this question, the court properly rejected the evidence pertaining to the in-

surance. Another complaint urged by plaintiff is that the court refused to permit counsel, on cross-examination of Allen Stith, to show by him that he had had previous experience in other personal injury claims in his family resulting from automobile accidents. We do not think such evidence was competent, since the question of previous accidents had nothing to do with the issues involved in the present case. Another complaint is that the court refused to permit plaintiff to introduce evidence showing that he had tendered back to defendants the $276 paid in settlement of the claim and that that sum was really in court. Since there was no dispute or issue involving the repayment or tender of payment of the amount received in settlement, we do not see how this question could have any bearing on the issues in the case. We do not think plaintiff's rights were prejudiced by the rejection to this evidence.

It is next insisted that Instruction No. 1 given to the jury, submitting to it the issue concerning the settlement, is erroneous and misleading. That instruction reads:

"You are instructed that the release executed by plaintiff on December 12, 1938, concerning which you have heard evidence, is binding upon the plaintiff, and you should find for the defendants, Allen Stith and Thomas J. Stith, regardless of how you find under Instruction No. 2, unless you shall believe from the evidence that at the time said release was executed the plaintiff did not have mental capacity sufficient to understand the nature and effect of such release, or unless you shall believe from the evidence that plaintiff was induced to execute said release by false representations to him by Allen Stith and Charles W. Porter, or either of them, of material facts, which representations were known by said Stith and Porter to be false and were not known by plaintiff to be false, and upon which representations plaintiff relied and but for which he would not have executed said release; in either of which latter events you are instructed that said release is not binding upon plaintiff."

The argument is that the court should have defined to the jury the term "mental capacity sufficient to understand," and to support this contention the case of Com-

monwealth Life Insurance Co. v. Ovesen, 257 Ky. 622, 78 S. W. (2d) 745, is cited. That case involved an insurance policy which contained the language "totally and permanently disabled." It was held that since a lay jury might not understand the terms "totally and permanently" in the sense they were used in the policy with reference to the degree of disability and time or duration of disability as indicated by these words, respectively, it was proper for the court to define such terms. Other insurance cases of similar holdings are also cited. We do not think that those cases are applicable to the present one, since it is not likely that a jury of common intelligence would fail to understand the meaning of the term "mental capacity sufficient to understand." We think such language is self-explanatory. The argument for plaintiff is that the jury might have understood the instruction to mean that plaintiff was mentally competent to make the settlement at the time and under the conditions it was made, unless the jury found that he was crazy or insane in the usual meaning of those terms. As we have already stated, there is no issue or contention by anyone that plaintiff was crazy or insane, but relied solely upon the grief and mental anguish he was suffering because of the death of his son. We do not think that the jury was misled by this instruction. It is to be noticed that plaintiff accepted and cashed the check on Tuesday, three days after his son was buried. The jury might have believed that within three days after the burial of his son plaintiff had sufficiently recovered from shock and mental anguish to be capable of understanding and appreciating the nature of the settlement. We think the evidence is sufficient to sustain the jury on that issue.

Another point insisted on for plaintiff to support the contention that the jury was misled by the instruction is that after the jury had retired to their room to deliberate they returned to the court room and the following occurred:

> "One of Jurors: In the event the majority find the plaintiff was in his right mind at the time he signed the release, is it necessary to consider the other?
>
> "The Court: No, sir; that ends it."

The jury thereupon again retired for deliberation.

"Mr. Hubbard: (To the Court) I think the jury should also be told that there are two things in that first instruction: whether he was in his right mind, or whether there were false representations."

The Court thereupon directed the jury to again be brought into open court.

"The Court: (To the jury) Relative to that question you asked—that question shows that you are considering the first instruction. Now, if under the first instruction you decide for the defendant, then you do not have to consider the second instruction. But you must take the first instruction in its entirety, not on just one part. I think that is plain.

"Juror: Does that release cover the obligations?

"The Court: That does, yes, if you find for the defendant under the first instruction. But the question you asked didn't take into consideration all that is in the first instruction; so I suggest that you go back and read that instruction over again."

The jury again retired for deliberation and returned a verdict.

No complaint is made as to the propriety or impropriety of the incident related above. Plaintiff raised the question only in support of his contention that the jury was confused as to the meaning of the instruction. We see nothing which indicates that the jury was confused. Evidently the admonition of the court specifically requesting the jury to read all of Instruction No. 1, which included the question of fraud and misrepresentation in the obtention of the settlement, as well as the mental capacity or incapacity of plaintiff made the issues clear to the jury.

Other instructions deal with the duty of defendant Thomas Stith in the operation of the car; contributory negligence of the deceased; and what is known as the last clear chance doctrine. We have examined all the instructions and find that they fairly presented to the jury all the issues involved in the pleadings and evidence and we think they are substantially correct.

The next complaint relates to the conduct of the

jury. It is insisted that a number of the members of the jury failed to reveal certain facts during the course of the selection of the jury. The jury was asked if any of them had been sued in the past five or ten years for damage claims, or any other suit, or had there been any claims against any of them or any immediate member of their family. All the members of the jury remained silent, which, of course, indicated an answer in the negative. It later developed that one member of the jury had been an adjuster for the Southern Bell Telephone and Telegraph Company, which fact he failed to reveal on the voir dire examination. We do not think the question asked the jury made it their duty to voluntarily reveal their present or past occupations since they were not asked that question. The question on voir dire related only to suits against the members of the jury or their immediate family for personal injuries.

It also appears that on the voir dire counsel asked the panel if they knew the women who worked at or operated the Riverview Inn where the accident occurred and no answer was given to this question except as indicated by the silence of the members of the jury. It is claimed that one of the jury knew, or knew of these women, and knew of their bad reputation. Neither of these women was called as witnesses, nor are they connected in the case in any manner so far as the record discloses. We do not see what bearing this could have had upon the issues.

The further complaint is made that the hearing of one of the jurors was impaired and an affidavit to that effect was filed with the motion for a new trial. It is not shown, however, that the juror did not hear well enough to understand the evidence sufficiently to enable him to make an intelligent decision. We find no merit in this complaint.

Finding no error prejudicial to the substantial rights of the plaintiff, the judgment is affirmed.